<u>NOT FOR PUBLICATION</u>                                    (Docket No. 12)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____ :
LESLIE MATOS                    :
                                :
          Plaintiff,            :    Civil No. 03-5320 (RBK)
                                :
     v.                         :    **OPINION**
                                :
THE PNC FINANCIAL SERVICES      :
GROUP, et al.,                  :
                                :
          Defendants.           :
_____ :


**KUGLER**, United States District Judge:

     This matter comes before the court on motion by Defendant
The PNC Financial Services Group for summary judgment of
Plaintiff Leslie Matos's claims for religious discrimination. For
the reasons set forth below, Defendant's motion for summary
judgment will be denied in part and granted in part.

**I.   Background**

     Plaintiff Leslie Matos ("Matos") has been an ardent
Jehovah's Witness since she was baptized in 1993. Every July she
attends an annual religious convention with approximately 20,000
other Jehovah Witnesses. The assembly takes place from Friday to
Sunday, but her entire congregation travels to the site the
Thursday prior to assist with preparation. In 2002, Matos'
employer, Defendant PNC Financial Services Group ("Defendant" or

the "Bank"), did not permit her to take Thursday and Friday off of work to attend the assembly, and Matos quit her job rather than miss the event. Matos alleges that the Bank's refusal to approve her absence was a failure to accommodate her religious beliefs as required by Title VII. Matos also alleges disparate treatment, constructive discharge, a hostile work environment, and intentional infliction of emotional distress. Defendant now moves for summary judgment on all claims.

Defendant hired Matos as part-time teller on October 30, 1998, and she informed the Bank of her religious beliefs soon thereafter. Because of the proximity of Halloween, the branch, including Matos' workstation, was decorated for the holiday. Matos explained that her religion did not permit such decorations and she moved them to another teller's station. Although she had to repeat her explanation and request every holiday, Matos does not contend that the Bank was hostile to the removal of decorations.

Matos' first significant conflict with the Bank arising out of her religious beliefs occurred in July 1999 when she asked manager Marion Sokol ("Sokol") for two days off of work so that she could attend the Jehovah's Witness convention. Because Matos was a part-time employee and had no vacation days, she requested the days off without pay. After initially denying the request, Sokol permitted Matos to take time off, but required that she

2

take the entire week off, instead of only two days. By taking the
full week off without pay, Matos was able to attend the assembly.

The issue of the convention did not arise again until 2002.
In 2000, Matos was on disability leave and consequently did not
need to request days off to attend the assembly. In 2001 the
assembly coincided with the death of Matos' father, and she was
able to go to the convention during the time she took off work to
be with her family. Matos went to Puerto Rico to attend the
funeral and then returned in time to go to the convention without
the Bank's knowledge before she resumed work the following
Monday.

In the year at issue, Matos initially approached the Bank in
January about her need to take two days off for the assembly in
July. However, the Bank issued vacation time in order of
seniority. A calendar was passed from employee to employee,
beginning with the individual who had been at the bank the
longest. Matos' supervisor informed her that she would have to
wait until she received the calendar to see if those days were
available.

By the time Matos received the calendar, another employee
had reserved the week of the assembly. Matos informed her
supervisors of the conflict. Per their instructions, Matos asked
the other employee if she would be willing to change vacation
dates; however, the employee's vacation was fixed and could not

be altered. Because Matos had to select a vacation week before passing the calendar on to the next employee, she reserved the week of May 27. She also took off June 20, 21, and the week of June 24 to attend the anniversary of her father's funeral in Puerto Rico. Consequently, by the time of the assembly in July, Matos had used all of her vacation and all but one of her paid occasional absence days. The record suggests that Matos believed that she had one paid occasional absence day and one "floating" day remaining to use for the convention, but it is unclear whether these days were actually available.

Additionally, at or around this time, Sokol informed Matos that the branch was instituting a new policy prohibiting more than one employee from being absent at one time. Prior to 2002, the Bank permitted two employees to take off the same day as long as one of the individuals was a teller and the other was a platform worker. While Sokol later acknowledged that the Bank would make exceptions to the new rule for reasonable requests, allowing more than one employee to be absent, it appears that Sokol did not inform Matos of such a possibility.

Matos raised the issue of the assembly with the Bank again in July. Sokol refused to grant her request for time off and asked Matos, "What is more important to you, your job or God?" Dawn Stewart, Matos' immediate supervisor, told her that if she took those days off without permission, Sokol would fire her for

4

insubordination. Matos was afraid that if she was fired, she would be escorted from the building by a security officer in a manner that would be extremely humiliating and disparaging to her religion. Believing that she would be fired if she went to the assembly, Matos turned in a letter of resignation that day.

In addition to the events of 2002, Matos alleges that the Bank frequently required her to stay late on Friday evenings even though her coworkers were allowed to leave. If the branch's accounts were not settled by the end of the work day on Friday, several tellers would be required to remain at work until the accounts were fully settled. However, Matos' fellow tellers were permitted to leave if they gave a reason such as having to tend to their children or having plans that required them to be elsewhere. However, the Bank did not permit Matos to leave, even though her supervisors knew that she had religious meetings on Friday evenings. Consequently, Matos alleges, on approximately three Fridays a month, she was the only teller remaining by the time the bank was settled. As a result, she was often late to her Friday meetings.

## II.  Standard of Review

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317,

330 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could find for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331. If the moving party has not fully discharged its initial burden, its motion for summary judgment must be denied. Id. at 332. If the moving party satisfies its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## III.    Discussion

## A.    Accommodation Claim

Title VII of the Civil Rights Act of 1964 requires employers to reasonably accommodate their employees' religious beliefs and practices as long as the accommodation will not create "undue hardship."[1] 42 U.S.C.§§ 2000e2(a)(1), 2000e(j) (1982); Shelton v.

---

[1] Title VII provides in relevant part: "It shall be an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual

6

<u>University of Med. & Dentistry of New Jersey</u>, 223 F.3d 220, 224 (3d Cir. 2000). To prevail on a claim of failure to accommodation, an employee must demonstrate: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement. <u>Shelton</u>, 223 F.3d at 224 (quoting <u>Protos v. Volkswagen of Am., Inc.</u>, 797 F.2d 129, 133-34 (3d Cir. 1986)).

Defendant argues that Matos failed to establish either the first or the third prongs of the prima facie case. Specifically, Defendant suggests that Matos did not provide sufficient evidence to show that attending the assembly was a sincere religious belief and that, because she quit her job, Matos was never disciplined for attending the assembly. Because Matos has raised material questions of fact as to both of these issues, Defendant's motion for summary judgment on Matos' accommodation claim will be denied.

**1.    Sincere Religious Belief**

For the purposes of Title VII, "[t]he term 'religion' includes all aspects of religious observance and practice, as

-----

with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (1982).

well as belief, unless an employer demonstrates that he is unable
to reasonably accommodate an employee's . . . religious
observance or practice without undue hardship on the conduct of
the employer's business." Shelton, 223 F.3d at 224 n.5 (quoting §
2000e(j)). Protos v. Volkswagen of Am., Inc., 797 F.2d 129, 133
(3d Cir. 1986) (quoting Trans World Airlines, Inc. v. Hardison,
432 U.S. 63, 74 (1977)). In protecting "*all* aspects" of
observance, practice, and belief, Title VII covers a wide range
of religious activities. § 2000e(j) (emphasis added). To
ascertain whether an activity qualifies as the kind of religious
belief that merits accommodation, courts look to "whether the
beliefs professed by a [claimant] are sincerely held and whether
they are, in his own scheme of things, religious." Bailey v.
Associated Press, 2003 WL 22232967 *7 (S.D.N.Y. 2003) (quoting
Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir.1984)). As long as
a belief is bona fide, an employer must accommodate it unless
accommodation would cause undue hardship.

Naturally, the determination of sincerity is a subjective
inquiry, requiring examination of "'an individual's inward
attitudes towards a particular belief system' in which a person's
claim 'that his belief is an essential part of a religious faith
must be given great weight.'" Id. ("[C]ourts have jettisoned the
objective, content-based approach previously employed to define
religious belief") (citing Davis v. Beason, 133 U.S. 333 (1890);

Reynolds v. United States, 98 U.S. 145 (1879)). Summary judgment
is seldom appropriate in subjective inquiries and, in religious
accommodation cases such as this, should be granted only where
"[o]n the record before the Court, a reasonable jury could only
conclude that [the employee's] religious assertion was not bona
fide."[2] Hussein v. The Waldorf-Astoria, 134 F. Supp. 2d 591, 597
(S.D.N.Y. 2001).

Because Matos presented sufficient evidence indicating that
her religious belief was bona fide, summary judgment must be
denied. Defendant does not dispute the sincerity of Matos'
religious beliefs; rather, Defendant argues that Matos failed to

_____

[2] Defendant raises Hussein in support of its argument that
Matos has not established that the assembly was a "religious
belief" for the purposes of Title VII. However, the Hussein court
granted summary judgment to defendant only because of a
tremendous quantity of evidence indicating that plaintiff's
alleged belief that he was religiously obligated to wear a beard
lacked sincerity. Specifically, the court found:

> The undisputed evidence shows that, until the night of
> the incident in question, Hussein had never worn a
> beard to work at the Waldorf--in some 14 years. Nor had
> he ever mentioned his religion to anyone at the Waldorf
> prior to the night in question. That night, he showed
> up for work with a beard that was only on eighth of an
> inch in depth, and it appeared that he had not shaved
> in two to five days. Hussein has made no effort to
> explain why, if his religion prevented him from
> shaving, he had never worn a beard before. He does not
> contend, for example, that he had just converted to his
> religion. Finally, within three months, he shaved his
> beard, an undisputed fact that also undercuts his claim
> of religious necessity.

Id. at 596-97.

establish that the assembly was a requirement of the Jehovah's Witness religion. However, for the purposes of a Title VII accommodation claim, Matos must demonstrate only that she had a bona fide religious belief and that attending the convention was an aspect "of religious observance [or] practice" of this belief. § 2000e(j).

The record is replete with demonstrations of Matos' religious devotedness, and suggests that Matos sincerely considered the convention a religious obligation. She attended the assembly every year for at least the past four years, along with every other member of her congregation. As demonstrated by the case at hand, she even quit her job, rather than miss the event. Since Matos' testimony of her own beliefs, supplemented by the factual record, must be given "great weight," she has satisfied her burden of demonstrating that the assembly was a bona fide religious practice for the purposes of summary judgment.

**2.   Discipline for failure to comply**

Defendant contends that because Matos resigned, she was not disciplined and therefore cannot satisfy the third factor of her accommodation claim. However, a showing of constructive discharge constitutes an adverse employment action under Title VII. Connors v. Chrysler Financial Corp., 160 F.3d 971, 973-74 (3d Cir. 1998); Zezulewicz v. Port Authority of Allegheny County, 290 F. Supp. 2d

10

583 (W.D. Pa. 2003). Because there exists a material question of fact as to whether Matos was constructively discharged, Defendant's motion for summary judgment on Matos' accommodation claim will be denied.

Defendant argues that Matos cannot bring a constructive discharge claim because the employment conditions she experienced were not "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Pennsylvania State Police v. Suders, 124 S. Ct. 2342, 2345 (2004). However, an employee can also establish a claim for constructive discharge when "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns." E.E.O.C. v. University of Chicago Hospitals, 276 F.3d 326, 331-32 (7th Cir. 2002); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2nd Cir. 1987) (holding that a trier of fact could reasonably find constructive discharge from a statement to employee that he would be fired at end of his probationary period).

An employer's threat to fire an employee can therefore constitute a constructive discharge. See e.g., Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 168 (3d Cir. 2001) (holding that there was no grounds for a finding of constructive discharge because "Paper Magic never threatened to fire Duffy [or] encouraged her to resign from her position"); Clowes v. Allegheny

<u>Valley Hosp.</u>, 991 F.2d 1159, 1161 (3d Cir. 1993) (characterizing a threat of discharge as a factor "commonly cited by employees who claim to have been constructively discharged.").

A threat to fire amounts to constructive discharge where a reasonable employee in the same circumstances would have believed she would be fired and would have resigned. <u>Clowes v. Allegheny Valley Hosp.</u>, 991 F.2d 1159, 1161 (3d Cir. 1993) ("We employ an objective test in determining whether an employee was constructively discharged from employment: whether 'the conduct complained of would have the foreseeable result that . . . a reasonable person in the employee's shoes would resign.'") (quoting <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1079 (3d Cir. 1992)).

Defendant contends that because Matos was never threatened by anyone who had authority to terminate her employment, she could not have been constructively discharged. However, constructive discharge does not depend on whether Matos would actually have been fired; rather, the inquiry lies in the reasonableness of her belief that she would be fired. Matos' immediate supervisor, Dawn Stewart, told her that she would be fired if she went to the convention, and Sokol told Matos that she must choose between her work or her God. A jury could reasonably construe either of these statements to be a threat of discharge.

12

Furthermore, an action taken by an employer, knowing that it will result in an employee's resignation can also constitute constructive discharge. In <u>Schafer v. Board of Public Education of the School District of Pittsburgh, Pennsylvania</u>, 903 F.2d 243, 250 (3d Cir. 1990), a case resembling that presently before the court, the plaintiff applied for a one year leave and informed his employer that he would be forced to resign in the event the request was denied. The Court held that the employer's denial of the request was sufficient to create a question of fact as to whether Schafer was constructively discharged. <u>See</u> <u>Gray</u>, 957 F.2d at 1082 ("In <u>Schafer</u> it certainly was not unreasonable to infer that the school board had intended to terminate the plaintiff since the plaintiff had stated that he would be forced to resign if the board would not grant him leave and, subsequently, that is exactly what the board did.").

A reasonable jury could find that Sokol knew Matos would resign if she was not given time off to attend the convention. Just as the employer in <u>Schafer</u> constructively discharged the plaintiff employee by refusing to grant his request for a year leave in spite of knowing that he would be forced to resign, a jury could find that the Bank constructively discharged Matos if the Bank knew that Matos would resign if her request was denied.

Ultimately, the question of whether it was reasonable for Matos to resign under the circumstances is a question of fact.

<u>Schafer</u>, 903 F.2d 243, 250 ("On appeal, we cannot make the fact-finding required to determine whether it was reasonable for Schafer to resign."). Because, Matos has provided sufficient evidence to raise a material question of fact as to whether she was constructively discharged, Defendant's motion for summary judgment on her accommodation claim must be denied.

## B.   Disparate Treatment Claim

Analysis of a disparate treatment claim for religious discrimination mirrors the framework for claims of racial discrimination articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 803-05 (1973). <u>Abramson v. William Paterson College of New Jersey</u>, 260 F.3d 265, 281-82 (3d Cir. 2001). To establish a prima facie case, the plaintiff must demonstrate: (1) she is a member of a protected class; (2) she was qualified for the job and nonetheless suffered an adverse employment action; and (3) nonmembers of the protected class were treated more favorably. <u>Id.</u> (citing <u>Goosby v. Johnson & Johnson Med., Inc.</u>, 228 F.3d 313, 318-19 (3d Cir. 2000). Once the plaintiff has demonstrated the three factors, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment decision. <u>Abramson</u>, 260 F.3d at 281-82. The plaintiff must then demonstrate that the proffered reason was pretextual. <u>Id.</u> (citing

14

Goosby, 228 F.3d at 319).[3]

## 1.   **Prima Facie Disparate Treatment Claim**

To establish a prima facie case sufficient to overcome
Defendant's motion for summary judgment, Matos need only
demonstrate that a material question of fact exists as to the
presence of each factor. Abramson, 260 F.3d 265. Matos has
presented adequate evidence to satisfy this burden. As a
Jehovah's Witness, Matos qualifies as a member of a protected
class under Title VII. Abramson, 260 F.3d at 282 ("Religion is a
protected category."). Furthermore, because Matos may have been
constructive discharged, as discussed above, there is a question
of material fact as to whether Matos has experienced an adverse
employment action.

Defendant contends that Matos does not satisfy the last
factor of the test because she cannot show that other employees
were treated more favorably. However, this argument ignores
evidence suggesting that Defendant readily granted permission to
other employees to take days off or leave work before the bank
had settled its accounts, but did not extend the same privileges
to Matos. Specifically, Matos alleges that the Bank made her stay

_____

[3] Analysis of a disparate treatment claim under the NJLAD
and Title VII are essentially the same. Consequently, the Court's
analysis of Matos' Title VII disparate treatment claim applies
equally to Matos' NJLAD claim. Abramson, 260 F.3d at 282 n.13
(3rd Cir. 2001).

at work late on approximately three Friday evenings per month
when all of the other employees were permitted to go home
earlier. She alleges that this disparate treatment occurred
because Defendant did not consider her religious meetings a
reasonable request or a sufficiently compelling reason to permit
her to leave. According to Matos, the other employees were not
required to stay because they "have to do something, or . . .
have plans." (Matos Dep. at 78.) However, Matos was required to
stay, even though the Bank knew that she had religious meetings
on Friday nights. As a result, she was often late to her
meetings. Denying Matos' requests while granting similar requests
of other employees suggests that other employees who were not
Jehovah's Witnesses were treated more favorably, thereby
satisfying the third prong of the prima facie test.

Matos argues that Defendant's refusal to grant her two days
off work to attend the assembly also constituted disparate
treatment. Matos provided evidence suggesting that Sokol knew
that Matos had additional time that she could take off for
personal business, but failed to inform Human Resources, who made
the ultimate decision to deny Matos' request. Allegedly Sokol
made this decision because she had an understanding of "personal
business" that excluded the convention. Similarly, Matos alleges
that Defendant did make exceptions to the rule that two employees
could not take the same days off. Such favors were granted when

16

the employer considered the employee's request to be
"reasonable." Yet, when Matos first requested the two days off in
January, Defendant refused permission because another employee
had reserved the same days. Defendant's failure to make an
exception suggests that Defendant did not consider the assembly a
sufficiently reasonable reason, a discretionary determination a
jury may consider disparate treatment.

Furthermore, Defendant has presented no evidence suggesting
that Matos' allegations of disparate treatment are false or that
her fellow employees were not given privileges that she was
denied. Accordingly, there exists a material question of fact as
to whether other employee's were treated more favorably, and
Matos has established a prima facie disparate treatment claim for
the purposes of avoiding summary judgment. Abramson, 260 F.3d at
281-82.

## 2.  Defendant's Legitimate, Non-Discriminatory Reason

Once a plaintiff has established a prima facie case, the
burden shifts to the defendant to proffer a legitimate, non-
discriminatory reason for the disparate treatment. If the
defendant is able to provide such a reason, the burden shifts
back to the plaintiff to demonstrate "pretext," in other words,
to "point to some evidence, direct or circumstantial, from which
a factfinder could reasonably either (1) disbelieve the
employer's articulated legitimate reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Abramson, 260 F.3d at 283 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994)). "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id.; see also Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995).

Defendant argues that it had a legitimate business reason for denying Matos' request for days off because she had used all of her vacation and paid occasional absence days for the year, her absence would adversely affect the operation of the branch, and she did not request time off until the day before the requested day off. However, Defendant offers no explanation for Matos' allegations that the Bank required her to stay late on Fridays while permitting all other employees to go home. Nor has Defendant addressed Matos' contention that Defendant grants unpaid absence days in addition to vacation and personal days for other employee's reasonable requests.

Defendant's arguments have limited force in light of the fact that the Bank's initial refusal to accommodate Matos'

18

request occurred in January of that year, when all of Matos'
vacation days remained. Furthermore, the record suggests that
Matos had not actually used all of her paid days off for the
year. The weakness of Defendant's arguments would permit a
reasonable jury to find that the Bank's actions were motivated by
discriminatory animus. Accordingly, summary judgment on Matos'
disparate treatment claim will be denied.

C.    **CONSTRUCTIVE DISCHARGE**

As explained above, Matos has raised a question of material
fact sufficient to avoid summary judgment as to whether she was
constructively discharged. However, constructive discharge is
merely a form of adverse employment action, and is not an
independent claim. See e.g., Knabe v. Boury Corp., 114 F.3d 407
(3d Cir. 1997) ("Knabe's constructive discharge claim, as
presented here, is not a separate ground for relief."); Drake v.
Minnesota Mining & Mfg., 134 F.3d 878, 886 (7th Cir. 1998) ("Not
only must conditions be intolerable; for a Title VII constructive
discharge claim to succeed, they must be intolerable because of
unlawful discrimination."). Because allegations of discriminatory
constructive discharge "do not state more than an employment
discrimination claim," constructive discharge is not a
"separately actionable" cause of action. Brock v. U.S., 64 F.3d
1421, 1423-24 (9th Cir. 1995).

Accordingly, to the extent that Matos is alleging an

19

independent claim for constructive discharge, Defendant's motion for summary judgment will be granted.

**D.   HOSTILE WORK ENVIRONMENT**

To establish a prima facie case for a hostile work environment under Title VII, a plaintiff must demonstrate: (1) she suffered intentional discrimination because of her religion; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in plaintiff's position; and (5) the employer is liable under principles of respondeat superior. Abramson, 260 F.3d at 276-77 (quoting Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir.1999).[4]

Defendant argues that Matos fails to demonstrate either that the complained-of conduct was attributable to her religious beliefs or that the discrimination was pervasive, severe, or regular. Defendant also raises an affirmative defense that the Bank had a sufficient anti-harassment procedure that Matos failed

_____

[4] The prima facie case under the New Jersey Law Against Discrimination is a similar test, though it excludes the respondeat superior requirement. Under the NJLAD, a plaintiff must show: "complained-of conduct (1) would not have occurred but for the employee's [religion]; and it was (2) severe or pervasive enough to make a (3) reasonable [Jehovah's Witness] believe that (4) the conditions of employment were altered and the working environment was hostile or abusive." Id. (quoting Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 114 (3d Cir. 1999). Because the tests are similar, the Court's analysis applies equally to Matos' Title VII and NJLAD claims for the purpose of the present motion.

to follow. Because this Court now finds that Matos alleged no conduct by Defendant sufficient to create a hostile environment, the Court will not reach the issues of Defendant's anti-harassment policy or discriminatory treatment.

To avoid summary judgment on a hostile work environment claim, the plaintiff must offer some proof that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Abramson, 260 F.3d at 278-79 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). The court then examines "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Abramson, 260 F.3d at 276-77 (3d Cir. 2001) (quoting Harris, 510 U.S. at 23); Hargrave v. County of Atlantic; 262 F. Supp. 2d 393, 414 (D.N.J. 2003).

Matos has alleged no severe or pervasive behavior that would create an abusive working environment under Title VII. In support of her claim, Matos lists only the allegedly discriminatory actions that have already been discussed: requiring Matos to stay late on Fridays in spite of her religious meetings, the use of

holiday decorations in her workstation, Sokol's initial refusal
to grant Matos days off in 1999 for the assembly, the refusal in
2002 leading to Matos' resignation, and Sokol's statement that
Matos must choose between her work or God.

With the exception of Sokol's statement, none of these acts
amount to the kind of "discriminatory intimidation, ridicule, and
insult" that can create a hostile work environment. Additionally,
while a reasonable factfinder could find Sokol's statement that
Matos must choose between work or God to be abusive, the "mere
utterance of an . . . epithet which engenders offensive feelings
in an employee" in insufficient "unless so severe or pervasive as
to constitute an objective change in the conditions of
employment." Faragher v. City of Boca Raton, 524 U.S. 775, 787
(1998). Consequently, none of the alleged conduct rises to the
level of abuse necessary for a hostile work environment claim,
and Defendant's motion for summary judgment of Matos' hostile
work environment claim will be granted.

## E. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant also argues that Matos did not experience "extreme
and outrageous conduct" sufficient to comprise a claim of
intentional infliction of emotional distress ("IIED").[5] To

---

[5] Defendant also notes that its Motion for Summary Judgment
is unopposed with regards to Matos' IIED claim. However, a
district court should not grant a motion for summary judgment
without examining the merits, solely on the basis that it is
unopposed. Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir.

establish a prima facie IIED claim, the plaintiff must show "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Tarr v. Ciasulli, 181 N.J. 70, 77 (N.J. 2004) (citing Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366 (1988)). Only behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" constitutes IIED. Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366 (1988).

For the same reasons that her claim for a hostile work environment cannot survive summary judgment, Matos has not sustained her burden of providing any evidence of conduct that meets the IIED outrageousness standard.

However, "[b]eyond a cause of action for emotional distress, our courts have long recognized emotional distress damages as a component of various intentional torts and breach of contract claims." Tarr v. Ciasulli, 181 N.J. 70, 78 (N.J. 2004); see also Nardello v. Township of Voorhees, 873 A.2d 577 (N.J. Super. App. Div. 2005) (permitting plaintiff who brought Conscientious Employee Protection Act claim against township to recover damages for emotional distress). In other words, plaintiffs can recover for emotional distress that is a result of other torts or

_____

1991) (citing Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev., 922 F.2d 168 (3d Cir. 1990)).

statutory violations even when they do not meet the high threshold of an IIED claim.

Consequently, even if she is not entitled to a stand-alone IIED claim, Matos may still raise emotional distress as an element of her other claims, including her claims under the New Jersey Law Against Discrimination (NJLAD). See Tarr v. Ciasulli, 181 N.J. 70, 78 (N.J. 2004) (recognizing that claims for emotional distress are permitted for causes of action, such as those asserting discrimination, based on willful conduct). Accordingly, Defendant's motion for summary judgment of Matos' IIED claim will be granted insofar as Matos is raising an independent cause of action for emotional distress.

The accompanying Order shall issue today.


Dated:   10/17/2005         S/ Robert B. Kugler
                            ROBERT B. KUGLER
                            United States District Judge

24